## I. C. R. R. Co. v. Hansbrough's Admr.

(Decided January 30, 1913.)

### Appeal from Hardin Circuit Court.

1. Master and Servant—Master's Liability for Injuries to Servant— Methods of Work.—A railroad company is liable to its employe,

who, while uncoupling a car for the purpose of making a running switch, in the usual and customary way, was, as the result of a violent, unusual, and unnecessary jerk of the train, caused by the engineer in charge, thrown from the car and injured.

2. Appeal—Review—Verdict—Sufficiency of Evidence to Support.—Evidence of a violent, unusual, and unnecessary jerk, held sufficient to support verdict for plaintiff.

3. Trial—Taking Case from Jury—Questions of Law or Fact.—Where a witness has made statements out of court, inconsistent with his testimony given on the trial, the credibility of the witness is for the jury.

4. Negligence—Contributory Negligence of Servant—Operation of Railroads.—Where the equipment of cars was such that, under ordinary conditions, it was not necessary for the flagman to go between the cars to uncouple them, yet, if the conditions or circumstances are such as would probably make it necessary for him to go between the cars to uncouple them, the question of contributory negligence of the servant, in so doing, should be submitted to the jury under proper instructions.

L. A. FAUREST, C. L. SIVLEY and TRABUE, DOOLAN & COX, for appellants.

H. L. JAMES, for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

James Hansbrough was, prior to August 31, 1911, in the employ of the Illinois Central Railroad Company in the capacity of flagman. For many years, he had worked as flagman on what is known as the coal train. Upon August 31st., the train crew, of which he was a member, had orders to place three empty coal cars at the McHenry mines. The train was a south or westbound train; the switch to the coal mine was on the right hand side of the track and had considerable up-grade to the mine. The sidetracks used by the company were on the left hand side of the main track. The coal train had orders to take the sidetrack at McHenry to permit a northbound freight train to pass. The switch had been previously thrown and the coal train pulled in upon the siding, as it cleared the main track, the freight train pulled out. The coal train then backed out on the main track and proceeded to place the empty cars at the mine in the way in which they were usually placed, and this was by making a running switch. Hansbrough's particular duty required him to uncouple the cars to be cut off from the remainder of the train. This necessitated his being between the cars to be uncoupled, and his proper place was upon the car to be cut off. He could not be upon the

ground, for the reason that the cars were moving, and it was necessary, after the cars were cut off, that he ride down with those that were turned into the switch, so as to put on the brake and stop them when they would reach the proper place. As it was his duty to disconect the cars, the engineer was governed in the movement of the engine by signals received from this brakeman. On the occasion in question, after the train had moved out on to the main track again and the air had been cut off, by Hansbrough, from the cars that were to be put on the sidetrack and the air line in these cars drained, he signaled the engineer that he was ready for the running switch to be made. Upon receipt of this signal to the engineer, through the fireman, the train at that point being on a curve so that he could not see the engineer, and hence had to give the signal to the fireman and he to the engineer, put the train in motion, and, having started it, reversed his engine sufficiently to cause the slack to be put in the train in order that Hansbrough might uncouple the rear cars from those in front of him. Immediately after having done this, the engineer started the engine forward with the view of running away from the cars cut off, so as to enable the switch to be thrown and the cars to be turned in on the siding. Just as the engineer started forward, after having slackened, to permit the cars to be uncoupled, Hansbrough fell in front of the cars that had been detached, and was run over and killed. His administrator instituted suit against the company for damages, alleging that the death of his intestate was due to the negligence of those in charge of the train, in this, that the action of the engineer resulted in giving the cars a violent, unusual, and unnecessary jerk, thereby throwing Hansbrough to the ground, to his injury and death. The company denied liability and pleaded contributory negligence: Upon a trial before a jury, the plaintiff recovered a verdict for $1,000; and the defendant appeals, and resists its right to a reversal upon the single point, to-wit: that the trial court erred in overruling its motion for a peremptory instruction.

As to the manner of the movement of this train, appellee introduced two witnesses, Dave Roberts, who was on the train that day, "learning the road," as he expresses it, evidently thereby meaning, familiarizing himself with the duties of brakeman. He testifies that

he was on top of a box car to be cut off, and that the jerk given by the train, which caused Hansbrough to fall, "was an awful jerk, I never seen none like it before." The other witness, D. A. Royal, who was in the vicinity where the switching was being done, testifies that the jerk seemed a little unusual. For the appellant, it is urged that the statement of D. A. Royal cannot be received as evidence of a violent, unusual, and unnecessary jerk; and that the witness, Dave Roberts, is thoroughly discredited, because, immediately after the accident, he gave a statement to employes of the company to the effect that the movement of the train was its usual customary, and ordinary movement. In explanation of this statement, he says that he was questioned by representatives of the company; that they prepared, and he signed, a statement; but he also adds, that possibly the statement contains other facts than those related by him, or intended by him to be incorporated therein. He testifies also, describing the character of the jerk, that it was of such violence that it threw him from near the center of the car, where he was standing, to the end; and that he would have fallen therefrom, had he not grabbed the brake rod, and, in this way, saved himself. The credibility of the witness was for the jury. They had before them the two statements, and the case is not different from that, which is frequently presented, where a witness has made statements out of court inconsistent with his testimony given on the trial. The jury, with the witnesses before them, is usually able to judge of the value of their testimony. In the case at bar, the statement made by this witness out of court was rejected by the jury; and no just ground of complaint is afforded on that account.

Conceding that the testimony of Royal is not sufficient to authorize the submission of the case to the jury on the question of negligence in the movement of the train, that of the witness, Roberts, is certainly sufficient for this purpose. If it was an "awful jerk", the hardest the witness ever saw, in his connection with the railroad and movement of trains, and of sufficient violence to almost throw him from the train, in the way and manner described by him, it cannot be said that there was no evidence of a violent, unusual, and unnecessary jerk, for the evidence shows that, at that point, the track toward the switch from the point where the cars were uncoupled was down grade, and hence, it was not necessary that the jerk

be such as might have been required, had the down grade been away from, instead of toward, the switch.

In addition, a rule of the company was introduced, requiring all trains, when making running switches, to be moved with great care. Said rule reads as follows: "A running switch must not be made when practicable to avoid it; but when made, great care must be taken to prevent accident." When this rule is read in connection with the testimony of the witnesses as to the grade upon which the cars were being moved, and the character of the jerk as described by the witness, Roberts, the trial court did not err in holding that there was sufficient evidence to authorize the submission of the case to the jury. In this particular, his ruling is in harmony with that announced by this court in the recent case of L. & A. R. R. Co., v. Phillips' Admr., 151 Ky., 445 (Advance Sheets), where the court said:

"The proof that there was a violent crash of the cars making a louder noise than the witness had ever heard before, would be sufficient to take the case to the jury on the question of negligence in that movement of the train * * * * * ."

In that case, the witness testified that the cars came together with a violent crash and made a louder noise, in so doing, than he had ever heard them make before; and the court held that this would have been sufficient evidence of negligent bumping together of the cars to authorize the submission of the case to the jury. No distinction can be drawn between the language used by the witness, in describing the bump in that case, and the jerk in this case.

It is next insisted that, even though the evidence that the jerk was of such character as would have authorized the submission of the case to the jury on the question as to whether or not the company was negligent in this particular, still, no recovery should be allowed for the reason that it is clearly shown that the deceased was himself guilty of such contributory negligence, but for which he could not have been injured. It is pointed out that these cars were so equipped with rods that it was unnecessary to go in between them in order to uncouple them, but that they could have been uncoupled by him while standing upon the car; and that it was negligence, amounting to almost recklessness on the part of the deceased, to go between the cars, and particularly to stand

upon the car attached to the engine, in uncoupling them; that, if he went between them at all, he should have stood upon the car which was cut off, and then the jerk forward by the engine could not have possibly injured him. There would be great force in this argument, but for the fact that the evidence shows that the car, in front of the one to be cut off, was loaded with timber, and it is not clear from the evidence that, under the circumstances, the deceased could have uncoupled these cars without going between them. With the evidence in this condition, the court would not have been warranted in directing a verdict for the defendant, but should have submitted the question, under proper instructions, as he did, to the jury.

Judgment affirmed.